UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ISIDRO ABASCAL,

                              Plaintiff,

                                                    9:04-CV-1401
v.                                                  (LEK/GHL)

BRYAN HILTON, Psychologist; and DR. MITCHELL
LANGBART, M.D.;

                              Defendants.

_____

APPEARANCES:                                        OF COUNSEL:

ISIDRO ABASCAL
   Plaintiff, *Pro Se*
P.O. Box 20198
New York, NY 10011

HON. ANDREW M. CUOMO                                RICHARD LOMBARDO, ESQ.
Attorney General of the State of New York           Assistant Attorney General
   Counsel for Defendant Hilton
The Capitol
Albany, NY 12224

GEORGE H. LOWE, United States Magistrate Judge

## **REPORT-RECOMMENDATION**

        This action has been referred to me for Report and Recommendation by the Honorable

Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local

Rule 72.3(c) of the Local Rules of Practice for this Court.  Isidro Abascal ("Plaintiff"), while an

inmate at Attica Correctional Facility, commenced this *pro se* civil rights action, pursuant to 42

U.S.C. § 1983, against, *inter alia*, two medical care providers employed (at the time) by the State

of New York--Bryan Hilton and Mitchell Langbart.  Generally, Plaintiff's Third Amended

Complaint alleges, in pertinent part, that, between December 27, 2001, and October 29, 2002, while he was incarcerated at Auburn Correctional Facility, Defendants Hilton and Langbart violated his rights under the First, Eighth and Fourteenth Amendments by wrongfully treating or classifying him as mentally ill and wrongfully transferring him to the Central New York Psychiatric Center as a form of punishment and/or retaliation for writing to public officials about certain "symptoms and body scars" that Plaintiff had allegedly experienced or sustained while in the custody of DOCS.  (*See generally* Dkt. No. 24 [Plf.'s Third Am. Compl.].)

Currently pending before the Court is Defendant Hilton's motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (Dkt. No. 37.) For the reasons that follow, I recommend that Defendant Hilton's motion be granted.  I also recommend that those of Plaintiff's claims against Defendant Hilton that are not the subject of Defendant Hilton's motion to dismiss be *sua sponte* dismissed pursuant to the Court's authority to do so under 28 U.S.C. § 1915(e)(2)(B)(ii), 28 U.S.C. § 1915A(b), and/or Rule 12(h)(3) of the Federal Rules of Civil Procedure.  Finally, I recommend that Plaintiff's claims against Defendant Langbart be *sua sponte* dismissed with prejudice for failure to serve, pursuant to Rules 4(m) and 16(f) of the Federal Rules of Civil Procedure.

## I.    BACKGROUND

### A.    Relevant Procedural History

Throughout the course of this action, Plaintiff has, in his several pleadings, asserted claims against a number of individuals.  All of those claims have been dismissed by Judge Kahn under Rules 8, 10 and/or 12 of the Federal Rules of Civil Procedure, except Plaintiff's claims against Defendants Hilton and Langbart.

Specifically, on January 5, 2005, Judge Kahn dismissed Plaintiff's claims, asserted in his original Complaint, against Defendants Jarkos, Tatum, Graham, Filion, Goodman, and Lape. (Dkt. No. 5, at 9.)  On March 1, 2005, Judge Kahn struck Plaintiff's Amended Complaint from the docket, under Rules 8, 10 and 12 of the Federal Rules of Civil Procedure.  (Dkt. No. 10.)  On June 15, 2006, Judge Kahn dismissed Plaintiff's claims, asserted in his Second Amended Complaint, against Defendants Muse, Smith, Pena, and "Unknown HTE Operators."  (Dkt. No. 23, at 8.)  On November 6, 2006, Judge Kahn dismissed Plaintiff's claims, asserted in his Third Amended Complaint, against Defendants Burge, Stone, Goord and Conway.  (Dkt. No. 25, at 3.)

Remaining in the case, following Judge Kahn's Order of November 6, 2006, were Plaintiff's claims against Defendants Hilton and Langbart.  (*Compare* Dkt. No. 25 [Order of 11/6/06] *with* Dkt. No. 24 [Plf.'s Third Am. Compl.].)

**B.      Plaintiff's Failure to Serve Defendant Langbart**

Prior to Judge Kahn's Order of November 6, 2006, regarding Plaintiff's Third Amended Complaint, none of Plaintiff's prior pleadings had been served on Defendants Hilton or Langbart. (*See generally* Docket.)  On November 6, 2006, Judge Kahn ordered, *inter alia*, that (1) "the Clerk shall issue summonses and forward them, along with copies of the [Third] Amended Complaint, to the United States Marshall for service on the [two] remaining Defendants," and (2) "Plaintiff shall . . . comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action."  (Dkt. No. 25, at 3-4.)  On January 27, 2007, the summonses for Defendants Hilton and Langbart were returned unexecuted because Plaintiff had, on the USM-285 Forms, listed their addresses as Auburn C.F., and both had left Auburn C.F. several years before.  (Dkt. No. 27.)

3

On February 5, 2007, the Clerk's Office for this Court sent a letter to the Deputy Counsel for the New York State DOCS requesting his assistance in determining whether DOCS has a current address on file for Defendants Hilton and Langbart (or whether, perhaps, Defendants Hilton and Langbart would designate an agent for service of process).  (Dkt. No. 28.)  On March 21, 2007, the Deputy Counsel responded with Defendant Hilton's current address but stated that Defendant Langbart was neither currently employed by DOCS nor was he previously employed by DOCS (but by the Central New York Psychiatric Center).  (Dkt. No. 29.)

On March 22, 2007, the Clerk's Office reissued summonses for Defendants Hilton and Lanbart.  (Dkt. No. 30.)  On March 26, 2007, an acknowledgment of service was filed as to Defendant Hilton.  (Dkt. No. 33.)  However, on April 26, 2007, the summons for Defendant Langbart was returned unexecuted because Plaintiff had, on the USM-285 Form, listed his address as "750 E. Adams St., Syr. NY 13210," and Langbart was "no longer [t]here."  (Dkt. No. 34.)

On June 28, 2007, in his motion to dismiss Plaintiff's Third Amended Complaint, Defendant Hilton stated, *inter alia*, that "[o]n April 27, 2007, the summons was returned un-executed as to defendant Langbart."  (Dkt. No. 37, Part 2, at 1, n.1.)  However, the docket contains no record of Plaintiff having completed another USM-285 Form as to Defendant Langbart.  Consequently, it appears he was never served with a copy of Plaintiff's Third Amended Complaint.

Because Plaintiff has not offered "good cause" for his failure to enable the Marshals Service to effect service on Defendant Langbart, Plaintiff has violated Rule 4(m) of the Federal Rules of Civil Procedure.  Alternatively, Plaintiff has violated Rule 16(f) of the Federal Rules of Civil Procedure due to the fact that he violated Judge Kahn's Order of November 6, 2006

4

(directing him to comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action," *see* Dkt. No. 25, at 4) by failing to complete new USM-285 Forms listing Defendant Langbart's current address.

As a result, the Court should dismiss Plaintiff's claims against Defendant Langbart. I note that the Court need not issue such an order only upon motion of defense counsel but may do so *sua sponte*. *See* Fed. R. Civ. 4(m) ("[T]he Court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time."); Fed. R. Civ. 16(f) ("[T]he judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just . . . .").

Remaining in the case, then, are only Plaintiff's claims against Defendant Hilton.

### C.      Summary of Plaintiff's Claims Against Defendant Hilton

In federal court, all pleadings must be liberally construed. *See* Fed. R. Civ. P. 8(e). Generally, pleadings filed by *pro se* civil rights litigants must be construed with an *extra* degree of liberality or leniency. This is because, generally, *pro se* litigants are unfamiliar with legal terminology and the litigation process, and because the civil rights claims they assert are of a very serious nature. However, "[t]here are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special solicitude" or extra leniency that is normally afforded *pro se* litigants.[1]  Generally, the rationale for withdrawing of this extra leniency (at least in the Second Circuit) is that the *pro se* litigant's extreme litigiousness demonstrates his *experience*, the lack of which is the reason for

---

[1]      *Koehl v. Greene*, 06-CV-0478, 2007 WL 2846905, at *3 & n.17 (N.D.N.Y. Sept. 26, 2007) (Kahn, J., adopting Report-Recommendation) [citations omitted].

extending extraordinary leniency to a *pro se* litigant in the first place.[2]

Here, Plaintiff is certainly no stranger to the court system, having filed some 13 federal or state court actions or appeals (other than the current action).[3]  I note that, by the time Plaintiff filed his Third Amended Complaint in this action on July 14, 2006, Plaintiff had filed some 12 federal or state court actions or appeals.[4]  Ordinarily, I would find that the Court should withdraw from Plaintiff, or at least diminish, the extraordinary leniency normally afforded to *pro se* litigants.  However, because Plaintiff, may well have been laboring under a mental illness at the

---

[2]        *Koehl*, 2007 WL 2846905, at *3 & n.18 [citations omitted].

[3]        **Federal Court Actions:** *Abascal-Montalvo v. I.N.S.*, 901 F. Supp. 309 (D. Kan. 1995) (habeas corpus proceeding, filed by Plaintiff *pro se*); *Abascal v. Thornburgh*, 90-CV-1399, Order of Dismissal (W.D. Okla. filed March 13, 1991) (habeas corpus proceeding, filed by Plaintiff *pro se*).
     **Federal Court Appeals:** *Abascal v. Thornburgh*, No. 91-6136, 1993 WL 118840 (10th Cir. Apr. 13, 1993) (appeal from decision by W.D. Okla., in habeas corpus proceeding, filed by Plaintiff *pro se*).
     **State Court Actions:** *Abascal v. Marshall*, Index No. 000520/2007 (N.Y. Sup. Ct., Bronx County) (Walker, J.) (Article 78 proceeding, filed by Plaintiff *pro se* on 1/11/07); *Abascal v. City of New York*, Index No. 401171/2006 (N.Y. Sup. Ct., New York County) (Feinman, J.) (Article 78 proceeding, filed by Plaintiff *pro se* on 5/31/06); *Abascal v. N.Y.S. Bd. of Parole*, Judgment of Dismissal (N.Y. Sup. Ct., Albany County, filed March 1, 2005) (Canfield, J.); *Abascal v. Maczek*, Judgment of Dismissal (N.Y. Sup. Ct., Albany County, filed Aug. 6, 2004) (Canfield, J.); *Abascal v. Roach*, Judgment of Dismissal (N.Y. Sup. Ct., Albany County, filed Fed. 14, 2004) (Teresi, J.) (dismissing Article 78 proceeding, filed by Plaintiff *pro se*); *Abascal v. Levy*, Index No. 402959/2003 (N.Y. Sup. Ct., New York County) (Wetzel, J.) (Article 78 proceeding, filed by Plaintiff *pro se* on 9/12/03).
     **State Court Appeals:** *Abascal v. Maczek*, 806 N.Y.S.2d 164 (N.Y. 2005) (denying motion for poor person relief during appeal from decision by Third Department in Article 78 proceeding, filed by Plaintiff *pro se*); *Abascal v. N.Y.S. Bd. of Parole*, 802 N.Y.S.2d 803 (N.Y. App. Div., 3d Dept., 2005) (appeal from decision by N.Y. Sup. Ct. in Article 78 proceeding, filed by Plaintiff *pro se*); *Abascal v. Roach*, 802 N.Y.S. 569 (N.Y. App. Div., 3d Dept., 2005) (appeal from decision by N.Y. Sup. Ct. in Article 78 proceeding, filed by Plaintiff *pro se*); *Abascal v. Maczek*, 796 N.Y.S.2d 757 (N.Y. App. Div., 3d Dept., 2005) (appeal from decision by N.Y. Sup. Ct. in Article 78 proceeding, filed by Plaintiff *pro se*).

[4]        (*Id.*)

time he drafted his Third Amended Complaint (for the reasons discussed below in this Report-Recommendation), I will continue to afford him special solicitude.[5]

Construed with an *extra* degree of liberality, Plaintiff's Third Amended Complaint alleges as follows.

1.      On December 27, 2001, Plaintiff was transferred from the Central New York Psychiatric Center ("CNYPC") to Auburn Correctional Facility ("Auburn C.F."), where he was interviewed by Defendant Hilton.  (*Id.* at ¶ 10.)  During the interview, Defendant Hilton asked Plaintiff if he wanted to live in the Intermediate Care Program ("ICP").  (*Id.*)  Plaintiff responded

---

[5]      I note that Plaintiff appears to have made a material misrepresentation to the Court in his Third Amended Complaint.  Specifically, in his Third Amended Complaint (which was verified), Plaintiff swore that, as of July 8, 2006 (the date of his Third Amended Complaint), the only "lawsuit[] [that Plaintiff had ever filed] in any state [or] federal court relating to [his] imprisonment" was the action of *Abascal v. New York*, Index No. 107872 (N.Y. Ct. of Cl.) (Minarik, J.) (action filed on 6/12/03, and judgment entered for Plaintiff on 11/22/04).  (Dkt. No. 24, ¶ 6 [Plf.'s Third Am. Compl.].)  While I have not found any record of this action in the New York State Unified Court System's electronic docketing system (and I therefore have not taken it into account in assessing Plaintiff's litigation experience), I have found record of at least *seven* other actions regarding Plaintiff's imprisonment which had been filed by Plaintiff before July 8, 2006.  (*See*, *supra*, note 3 of this Report-Recommendation.)  Generally, such information is material in prisoner civil rights actions since it enables the Court to determine one or more of the following issues: (1) whether any of the issues in the action have been previously litigated and decided (for purposes of the doctrines of res judicata and collateral estoppel); (2) whether the plaintiff had, prior to being granted *in forma pauperis status* in this action, earned "three strikes" for purposes of 28 U.S.C. § 1915(g); (3) whether the plaintiff had a record of frivolous litigation sufficient to warrant either (a) what is known as a "bar order" (i.e., an order barring him from litigating further in that court without meeting certain preconditions) pursuant to 28 U.S.C. § 1651(a), or (b) an order declaring plaintiff to be a "vexatious" litigator pursuant to 28 U.S.C. § 1927; and (4) whether the plaintiff's litigation experience was so extraordinary that it effectively dispenses with the need to afford him special solicitude.  While a plaintiff is under no duty to provide this information in order to state an actionable civil rights claim, here, Plaintiff chose to provide the information and swore to the truthfulness of it.  Ordinarily, I would find such a material misrepresentation to be sanctionable.  However, because Plaintiff may well have been laboring under a mental illness at the time he drafted his Third Amended Complaint, I will not recommend that the Court sanction him for his material misrepresentation.

that he neither wanted to live in ICP nor take psychotropic medication, but that he wanted to live in the prison's general population.  (*Id*.)

2.      At some point between December 27, 2001, and April 25, 2002, Plaintiff sent a letter to then-Governor George Pataki concerning "symptoms and body scars" that Plaintiff had experienced or sustained while in the custody of DOCS.  (*Id*. at ¶ 12.)  While Plaintiff does not attach a copy of this letter to his Third Amended Complaint, he does describe the substance of the letter in some detail.  (*Id*. at ¶ 12.a.-12.d.)  Among the symptoms described in the letter were the following: (1) the sensation that Plaintiff's "mind was being read" and that he had been subjected to the "broadcasting of [his] thoughts [by someone else]"; (2) the sensation that Plaintiff had also been subjected to "sleep deprivation," "changes to [his] hearing," "waking visions . . . synced with body motions," "wild flailing of arms and legs, sometimes followed by rigor mortis," "very high body heat," "sudden, violent itching" in "hard-to-reach areas," "electrical shock[s]," "cigarette burn type scars," and "penis shriveling"; and (4) the fact that he had been "sexually provoked by female staff for many years while in the custody of the DOCS." (*Id*.)

3.      Apparently, Plaintiff alleges that these symptoms and scars were caused by the "pscyho-electronic weapons" and "behavior modification experimentation" (including "personality breaking techniques") to which he has been involuntarily subjected by DOCS.  (*Id*. at ¶¶ 16, 40, 41 & Ex. 8.)

4.      On April 25, 2002, Defendant Hilton "interviewed" Plaintiff because of the letter he had sent to Governor Pataki.  (*Id*. at ¶ 12.)

5.      At some point before June 17, 2002, Plaintiff sent a letter to DOCS Deputy

8

Commissioner of Corrections Lucien LeClaire, concerning the above-described "symptoms and body scars."  (*Id*. at ¶ 13.)

6.      On June 17, 2002, Defendant Hilton "interviewed" Plaintiff because of the letter he had sent to Deputy Commissioner LeClaire.  (*Id*.)  During the meeting, Defendant Hilton asked Plaintiff if the symptoms he alleged were becoming worse, and Plaintiff responded that they were.  (*Id*.)

7.      At some point before July 18, 2002, Plaintiff sent a letter to the DOCS Inspector General concerning the above-described "symptoms and body scars."  (*Id*. at ¶ 14.)

8.      On July 18, 2002, a correctional sergeant informed Plaintiff that he could not leave his cell until he had been interviewed by a Mental Health Unit psychologist because of the letter he had written to the DOCS Inspector General, concerning the above-described "symptoms and body scars."  (*Id*.)

9.      On July 19, 2002, Defendant Hilton "interviewed" Plaintiff because of the letter he had written to the DOCS Inspector General.  (*Id*. at ¶ 15.)  During the meeting, Plaintiff told Defendant Hilton that he just wanted to be left alone so that he could pursue his college education.  (*Id*.)  In addition, Plaintiff showed Defendant Hilton his "irritated face," which bore "multiple little bumps, and patches of redness."  (*Id*.)

10.     At some point before October 24, 2002, Plaintiff sent a letter to a New York State senator concerning the above-described "symptoms and body scars."  (*Id*. at ¶ 16.)

11.     On October 24, 2002, Defendant Hilton "interviewed" Plaintiff because of the letter he had written to the New York State senator.  (*Id*.)  During the meeting, Defendant Hilton (and Dr. Mitchell Langbart, who was also present) tried to persuade, or "coerce," Plaintiff to stop

writing such letters.  (*Id*.)  Specifically, Dr. Langbart asked Plaintiff, "Do you want to be transferred to CNYPC and miss your college semester, or stay in the facility and be able to finish it?"  (*Id*.)[6]  Plaintiff responded that he would "do what he had to do," and that Langbart and Hilton would do "what they wanted to do."  (*Id*.)  Defendant Hilton responded that "all the pain and discomfort that plaintiff was suffering was maybe a revenge."  (*Id*.)  Subsequently, Plaintiff was placed in a "strip cell" with just his underwear and a mattress.  (*Id*.)

12.    On October 29, 2002, Plaintiff was transferred back to CNYPC.  (*Id*. at ¶ 18.) While at CNYPC, Plaintiff was told by Dr. Qamar Abassi that he had been sent to CNYPC because he had not been eating.  (*Id*.)  Plaintiff responded that that was false.  (*Id*.)

13.    On December 6, 2002, Plaintiff was again transferred from CNYPC to Auburn C.F.  (*Id*. at ¶ 28.)  Plaintiff alleges that, during the two months that followed the transfer, he wrote a letter to a politician concerning the above-described "symptoms and body scars," and that he was "interviewed" by "an individual from [the Mental Health Unit" because of the letter (and apparently urged not to write such letters).  (*Id*. at ¶ 29.)  He also alleges that, during the six months that followed the interview, he was interviewed by two other psychologists.  (*Id*. at ¶¶ 37, 39.)  However, he does not allege that any of these three interviews were conducted by, or even were caused by, Defendant Hilton.  (*See generally id*. at ¶¶ 28-45 [not mentioning Defendant Hilton]; *see also id*. at Exs. 1-3, 5 [attaching grievances and complaint-letters not mentioning Defendant Hilton].)

---

[6]    Apparently, during the time in question, Plaintiff had already received his college degree and was pursuing an advanced degree at Cornell University.  (Dkt. No. 24, Ex. 5 [Plf.'s Third Am. Compl., attaching Plaintiff's letter of 31/1/03 to James L. Stone, Commissioner of New York State Office of Mental Health]; *see also* Dkt. No. 24, Ex. 8 at 3 [attaching medical record summarizing Plaintiff's education].)

**D.      Summary of Arguments on Defendant Hilton's Motion to Dismiss**

In his memorandum of law, Defendant Hilton argues that Plaintiff's claims against him,

asserted in Plaintiff's Third Amended Complaint, should be dismissed for failure to state a claim

for two alternative reasons: (1) Plaintiff fails to allege facts plausibly suggesting that Defendant

Hilton was personally involved in any of the constitutional violations alleged by Plaintiff; and (2)

even assuming as true all of the factual allegations of Plaintiff's Third Amended Complaint,

Defendant Hilton is protected from liability by the doctrine of qualified immunity, as a matter of

law.  (Dkt. No. 37, Part 2, at 4-7.)

In his memorandum of law, Plaintiff responds to both of Defendant Hilton's arguments.

With regard to Defendant Hilton's personal-involvement argument, Plaintiff argues that (1)

Paragraphs 10, 15 and 18 of his Third Amended Complaint allege facts plausibly suggesting that

Defendant Hilton "arbitrarily classified plaintiff as mentally ill," (2) Paragraphs 12, 13, 14 and 16

of his Third Amended Complaint allege facts plausibly suggesting that Defendant Hilton

"persecuted him for writing to public officials," (3) Paragraph 16 of his Third Amended

Complaint alleges facts plausibly suggesting that Defendant Hilton "threatened" and "coerced"

him not to write to public officials, (4) Paragraphs 14 and 16 of his Third Amended Complaint

allege facts plausibly suggesting that Defendant Hilton, wrongfully "secluded" him in a "strip

cell," and (5) Paragraph 18 of his Third Amended Complaint allege facts plausibly suggesting

that Defendant Hilton transferred Plaintiff to the Central New York Psychiatric Center for

writing to a State Senator.  (Dkt. No. 40, Part 1, at 3-6.)

With regard to Defendant Hilton's qualified immunity argument, Plaintiff essentially

argues that Defendant Hilton fails to appreciate that it was clearly established that the First

11

Amendment forbade Defendant Hilton from inhibiting Plaintiff from, or retaliating against him

for, exercising his right to send letters of complaint to public officials about his prison

conditions.  (*Id*. at 6-9.)

## II.    GENERAL LEGAL STANDARD

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to

dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ.

P. 12(b)(6).  It has long been understood that a defendant may base such a motion on either or

both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Rule 8(a)(2);[7] or

(2) a challenge to the legal cognizability of the claim.[8]

---

[7]       *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted); *Princeton Indus., Inc. v. Rem*, 39 B.R. 140, 143 (Bankr. S.D.N.Y. 1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello*, 55 F.R.D. 72, 74 (S.D.N.Y. 1972) ("This motion under Fed. R. Civ. P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed. R. Civ. P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.'").

[8]       *See  Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest. . . .  In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas*, 308 F.3d 180, 187 (2d Cir. 2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation . . . fails as a matter of law.") (citation omitted); *Kittay v. Kornstein*, 230 F.3d 531, 541 (2d Cir. 2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 379 F. Supp.2d 348, 370 (S.D.N.Y. 2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6)].") (citation omitted); *Util. Metal Research & Generac Power Sys.*, 02-CV-6205,

12

Rule 8(a)(2) requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Such a statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."[9]  The purpose of this rule is to "facilitate a proper decision on the merits."[10]  A complaint that fails to comply with this rule "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims."[11]

The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading

---

2004 U.S. Dist. LEXIS 23314, at *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a]); *accord*, *Straker v. Metro Trans. Auth.*, 331 F. Supp.2d 91, 101-102 (E.D.N.Y. 2004); *Tangorre v. Mako's, Inc.*, 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion--one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

[9]     *Dura Pharmaceuticals, Inc. v. Broudo*, 125 S. Ct. 1627, 1634 (2005) (holding that the complaint failed to meet this test) (quoting *Conley*, 355 U.S. at 47); *see also Swierkiewicz*, 534 U.S. at 512 (quoting *Conley*, 355 U.S. at 47); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993) (quoting *Conley*, 355 U.S. at 47).

[10]     *See Swierkiewicz*, 534 U.S. at 514 (quoting *Conley*, 355 U.S. at 48).

[11]     *Gonzales v. Wing*, 167 F.R.D. 352, 355 (N.D.N.Y. 1996) (McAvoy, J.), *aff'd*, 113 F.3d 1229 (2d Cir. 1997) (unpublished table opinion).  Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history.  *See, e.g.*, *Photopaint Technol., LLC v. Smartlens Corp.*, 335 F.3d 152, 156 (2d Cir. 2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.*, 104 F.3d 355 [2d Cir. 1996]).

requirements that exceed this liberal requirement.[12]  However, it is well established that even this

liberal notice pleading standard "has its limits."[13]  As a result, several Supreme Court decisions,

and Second Circuit decisions, exist holding that a pleading has failed to meet this liberal notice

pleading standard.[14]

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly*, the

Supreme Court, in reversing an appellate decision holding that a complaint had stated a claim

upon which relief could be granted, "retire[d]" the famous statement by the Court in *Conley v.*

*Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state

a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his

---

[12]    *See*, *e.g.*, *Swierkiewicz*, 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s
simplified pleading standard applies to all civil actions, with limited exceptions [including]
averments of fraud or mistake.").

[13]    2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed. 2003).

[14]    *See*, *e.g.*, *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-1974 (2007)
(pleading did not meet Rule 8[a][2]'s liberal requirement), *accord*, *Dura Pharmaceuticals*, 125
S. Ct. at 1634-1635, *Christopher v. Harbury*, 536 U.S. 403, 416-422 (2002), *Freedom Holdings,*
*Inc. v. Spitzer*, 357 F.3d 205, 234-235 (2d Cir. 2004), *Gmurzynska v. Hutton*, 355 F.3d 206, 208-
209 (2d Cir. 2004).  Several unpublished decisions exist from the Second Circuit affirming the
Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz*.  *See*, *e.g.*, *Salvador v. Adirondack Park*
*Agency of the State of N.Y.*, No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr. 26, 2002)
(affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule
8[a][2]).  Although these decisions are not themselves precedential authority, *see* Rules of the
U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued
precedential effect, after *Swierkiewicz*, of certain cases from within the Second Circuit
interpreting Rule 8(a)(2).  *See Khan v. Ashcroft*, 352 F.3d 521, 525 (2d Cir. 2003) (relying on
summary affirmances because "they clearly acknowledge the continued precedential effect" of
*Domond v. INS*, 244 F.3d 81 [2d Cir. 2001], after that case was "implicitly overruled by the
Supreme Court" in *INS v. St. Cyr*, 533 U.S. 289 [2001]).

claim which would entitle him to relief."  127 S. Ct. 1955, 1968-1969 (2007).[15]  Rather than

turning on the conceivability of an actionable claim, the Court clarified, the Rule 8 standard turns

on the "plausibility" of an actionable claim.  *Id*. at 1965-1974.  More specifically, the Court held

that, for a plaintiff's complaint to state a claim, his "[f]actual allegations must be enough to raise

a right to relief above the speculative level [to a plausible level]" assuming, of course, that all the

allegations in the complaint are true.  *Id*. at 1965 [citations omitted].  What this means, on a

practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other

words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of

[actionable conduct]."  *Id*.; *see also Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) ("[W]e

believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly*] is . . . requiring a flexible

'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in

those contexts where such amplification is needed to render the claim *plausible*.") [emphasis in

original],

It must be remembered that, "[i]n reviewing a complaint for dismissal under Rule

12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all

reasonable inferences in the plaintiff's favor."[16]  "This standard is applied with even greater force

---

[15]        The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint. . . .  *Conley*, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival."  *Twombly*, 127 S. Ct. at 1969.

[16]        *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994).

where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se*."[17]
In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are
to be construed with an *extra* degree of liberality.  Indeed, "courts must construe *pro se* pleadings
broadly, and interpret them to raise the strongest arguments that they suggest."[18]  Moreover,
when addressing a *pro se* complaint, generally a district court "should not dismiss without
granting leave to amend at least once when a liberal reading of the complaint gives any indication
that a valid claim might be stated."[19]

     Of course, granting a *pro se* plaintiff an opportunity to amend is not required where the
plaintiff has already been given a chance to amend his pleading.[20]  Moreover, an opportunity to
amend should be denied where "the problem with [plaintiff's] causes of action is substantive"

---

[17]     *Hernandez*, 18 F.3d at 136 (citation omitted); *see also Deravin v. Kerik*, 335 F.3d
195, 200 (2d Cir. 2003) (citations omitted); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 619 (2d
Cir. 1999) (citation omitted).

[18]     *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000) (finding that plaintiff's
conclusory allegations of a due process violation were insufficient) (internal quotation and
citation omitted).

[19]     *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (internal quotation and
citation omitted); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when
justice so requires").

[20]     *Muniz v. Goord*, 04-CV-0479, 2007 WL 2027912, at *2, n.14 (N.D.Y.Y. July 11,
2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord*, 04-CV-
1433, 2007 WL 201109, at *5, n.34 (N.D.N.Y. Jan. 23, 2007) (Kahn, J., adopting report-
recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.*, 04-CV-1262, 2007
WL 119453, at *2, n.13 (N.D.N.Y. Jan. 10, 2007) (Hurd, J., adopting report-recommendation of
Lowe, M.J.); *Collins v. Fed. Bur. of Prisons*, 05-CV-0904, 2007 WL 37404, at *4, n.30
(N.D.N.Y. Jan. 4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Goros v.
Cent. Office Review Comm.*, 03-CV-0407, 2006 WL 2794415, at *5, n.18 (N.D.N.Y. Sept., 26,
2006) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Williams v. Weaver*, 03-CV-
0912, 2006 WL 2799417, at *4, n.16 (N.D.N.Y. Sept. 26, 2006)  (Kahn, J., adopting report-
recommendation of Lowe, M.J.).

such that "[b]etter pleading will not cure it."[21]  This is because, even when a plaintiff is

proceeding *pro se*, "all normal rules of pleading are not absolutely suspended."[22]

## III.   ANALYSIS

### A.   Whether Plaintiff Has Failed to State a First Amendment Claim

Liberally construed, Plaintiff's Third Amended Complaint asserts two related but different

types of First Amendment claims against Defendant Hilton: (1) a claim that Defendant Hilton

retaliated against Plaintiff for engaging in speech or activity that was protected by the First

Amendment; and (2) a claim that Defendant Hilton impermissibly interfered with Plaintiff's right

to petition the government for the redress of grievances.  (Dkt. No. 24, ¶ 47 & Prayer for Relief, ¶

A.1.)

---

[21]     *Cuoco*, 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted).

[22]     *Stinson v. Sheriff's Dep't of Sullivan Cty.*, 499 F. Supp. 259, 262 & n.9 (S.D.N.Y. 1980); *accord, Standley v. Dennison*, 05-CV-1033, 2007 WL 2406909, at *6, n.27 (N.D.N.Y. Aug. 21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord*, 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.*, 489 F. Supp.2d 305, 307 (W.D.N.Y. 2007); *Cosby v. City of White Plains*, 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb. 9, 2007); *Lopez v. Wright*, 05-CV-1568, 2007 WL 388919, at *3, n.11 (N.D.N.Y. Jan. 31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord*, 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan. 23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.*, 04-CV-1262, 2007 WL 119453, at *2, n.13 (N.D.N.Y. Jan. 10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons*, 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan. 4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

### 1.      Retaliation for Engaging in Protected Activity

Claims of retaliation like those asserted by Plaintiff find their roots in the First

Amendment.[23]  Central to such claims is the notion that, in a prison setting, corrections officials

may not take actions which would have a chilling effect upon an inmate's exercise of First

Amendment rights.[24]  Because of the relative ease with which claims of retaliation can be

incanted, however, courts have scrutinized such retaliation claims with particular care.[25]  As the

Second Circuit has noted,

> This is true for several reasons.  First, claims of retaliation are difficult
> to dispose of on the pleadings because they involve questions of intent
> and are therefore easily fabricated.  Second, prisoners' claims of
> retaliation pose a substantial risk of unwarranted judicial intrusion into
> matters of general prison administration.  This is so because virtually
> any adverse action taken against a prisoner by a prison official--even
> those otherwise not rising to the level of a constitutional violation--can
> be characterized as a constitutionally proscribed retaliatory act.[26]

To prevail on a First Amendment claim of retaliation under 42 U.S.C. § 1983, a plaintiff

must prove by a preponderance of the evidence the following: (1) that the speech or conduct at

issue was "protected"; (2) that the defendants took "adverse action" against the plaintiff–namely,

action that would deter a similarly situated individual of ordinary firmness from exercising his or

her constitutional rights; and (3) that there was a causal connection between the protected speech

and the adverse action--in other words, that the protected conduct was a "substantial or

---

[23]      *See Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004).

[24]      *See Gill*, 389 F.3d at 381-383.

[25]      *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).

[26]      *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) [citations omitted], *overruled
on other grounds*, *Swierkewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

motivating factor" in the defendants' decision to take action against the plaintiff.[27]  Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone.[28]

Here, Plaintiff appears to argue that the "protected" speech or conduct in which he had engaged when he was punished by Defendant Hilton consisted of sending letters to four New York State officials (Governor George Pataki, DOCS Deputy Commissioner Lucien LeClaire, the DOCS Inspector General, and a New York State senator) concerning "symptoms and body scars" that he had allegedly experienced or sustained while in the custody of DOCS.  (Dkt. No. 24, ¶¶ 12-14, 16.)  Although Plaintiff does not specifically allege that his letters contained complaints of mistreatment and requests for intervention, I liberally construe them as doing so.  Furthermore, for the sake of argument, I will assume that such letters constituted speech or conduct that was "protected" by the First Amendment.

The first problem with Plaintiff's retaliation claim is that, by and large, it fails to allege any facts plausibly suggesting that Defendant Hilton took any "adverse action" against Plaintiff. For example, Plaintiff alleges that, following his letters to Governor Pataki, Deputy Commissioner LeClaire, and the Inspector General, Defendant Hilton only "interviewed" Plaintiff about the subject matter of the letters.  (Dkt. No. 24, ¶¶ 12, 13, 15, 16.)  It is difficult for me to imagine circumstances under which an inquiry by a prison psychologist about a prisoner's complaints that his "mind was being read," and he was being subjected to "waking visions,"

---

[27]     *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Gill*, 389 F.3d at 380 (citing *Dawes v. Walker*, 239 F.3d 489, 492 [2d Cir. 2001]).

[28]     *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) [citations omitted].

19

"changes to [his] hearing," and the involuntary "flailing of [his] arms and legs" could be construed as anything other than sound medical treatment. (I certainly cannot conceive of it as being "adverse action.") I note that, in the sole detailed account of these "interviews" that Plaintiff provides in his Third Amended Complaint, he acknowledges that Defendant Hilton had asked him if the symptoms alleged in his letters were getting worse. (*Id*. at ¶ 13.)

The only "adverse action" that Plaintiff has even remotely alleges is Plaintiff's placement in a "strip cell with just his underwear and mattress" on October 24, 2002, after Defendant Langbart tried to "coerce" Plaintiff to stop writing letters like his recent letter to a New York State senator concerning his alleged "symptoms and body scars," and Plaintiff had responded that he would "do what he had to do." (*Id*. at ¶ 16.) For the sake of argument, I will assume this is "adverse action." Even it were an "adverse action," Plaintiff's retaliation claim would fail.

This is because the second problem with Plaintiff's retaliation claim is that he alleges absolutely no facts plausibly suggesting that this particular instance of "adverse action" was *causally connected* to the "protected conduct" in which Plaintiff had engaged. Plaintiff's allegation that, immediately before he was placed in a "strip cell," Defendant Hilton told him that "all the pain and discomfort that plaintiff was suffering was maybe a revenge" is too cryptic and innocuous to plausibly suggest a causal link between the "protected conduct" and the "adverse action." (*Id*.) Moreover, any shred of a conceivable causal connection between Defendant Hilton's statement and Plaintiff's placement in a "strip cell" is severed when one considers the *nature* of the symptoms of which Plaintiff had complained, which, included a belief that his "mind was being read," that his hearing was being manipulated, that he saw "waking visions," that he felt "violent itching" which could not be stopped, that he lacked control of his arms and

20

legs, that he was being scarred and burned by "electrical shock[s]," and that he was being "provoked by female staff." (*Id*. at ¶ 12.)  By any rational assessment, it was these symptoms, and not Defendant Hilton, that *caused* Plaintiff to be placed in a strip cell.

Indeed, Plaintiff does not even allege sufficient facts to plausibly suggest that it was Defendant Hilton, and not Defendant Langbart, who took the "adverse action" of placing Plaintiff in the "strip cell." (*Id*. at ¶ 16.)  I note that it was Defendant Langbart, not Defendant Hilton, whom Plaintiff alleges wrongfully transferred him to the CNYPC less than a week after this October 24, 2002, placement in a "strip cell." (Dkt. No. 24, ¶ 18 & Exs. 1-2.)  As a result, I am persuaded that Defendant Hilton's lack-of-personal-involvement argument serves as an alternative ground for dismissing Plaintiff's retaliation claim against Defendant Hilton.[29]

For both of these alternative reasons, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claim against Defendant Hilton.

---

[29]        I note that none of the paragraphs (of Plaintiff's Third Amended Complaint) cited in Plaintiff's opposition memorandum of law actually alleges facts plausibly suggesting Defendant Hilton's personal involvement in any constitutional violation. (Dkt. No. 40, Part 1, at 4.)  For example, Paragraphs 10, 15 and 18 of Plaintiff's Third Amended Complaint do not allege facts plausibly suggesting either that it was Defendant Hilton who "classified" Plaintiff as mentally ill or that such classification was "arbitrary," as Plaintiff argues in his memorandum of law.  (*See* Dkt. No. 47, ¶¶ 10, 15, 18.)  Nor do Paragraphs 12, 13, 14 and 16 of Plaintiff's Third Amended Complaint allege facts plausibly suggesting that Defendant Hilton "persecuted" Plaintiff for writing to public officials, as Plaintiff argues in his memorandum of law.  (*See* Dkt. No. 47, ¶¶ 12-14, 16.)  Nor does Paragraph 18 of Plaintiff's Third Amended Complaint allege facts plausibly suggesting that it was Defendant Hilton who caused Plaintiff to be transferred to CNYPC, as Plaintiff argues in his memorandum of law.  (*See* Dkt. No. 47, ¶ 18.)

### 2.    Interference with Right to Petition Government

It is well settled that inmates have a First Amendment right to "petition the Government for a redress of grievances."[30]  This right, which is more informally referred to as a "right of access to the courts," requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights."[31]  "However, this right is not 'an abstract, freestanding right to a law library or legal assistance' and cannot ground a Section 1983 claim without a showing of 'actual injury.'"[32]  As a result, to state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury.[33] It is worth noting that "[t]his actual injury requirement 'is not satisfied by just any type of frustrated legal claim,' because the Constitution guarantees only the tools that 'inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement."[34]  "'Impairment of any *other* litigating capacity is simply one of the incidental

---

[30]      *See* U.S. CONST. amend I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.").

[31]      *Bounds v. Smith*, 430 U.S. 817, 828 (1977), *modified on other grounds*, *Lewis v. Casey*, 518 U.S. 343, 350 (1996); *see also Bourdon v. Loughren*, 386 F.2d 88, 92 (2d Cir. 2004) [citations omitted].

[32]      *Collins v. Goord,* 438 F. Supp.2d 399, 415 (S.D.N.Y. 2006) (quoting *Lewis v. Casey*, 518 U.S. 343, 351 [1996]).

[33]      *Lewis*, 518 U.S. at 353; *Renelique v. Duncan*, 03-CV-1256, 2007 WL 1110913, at *9 (N.D.N.Y. Apr. 12, 2007) (Strom, J.); *Howard v. Leonardo*, 845 F. Supp. 943, 946 (N.D.N.Y. 1994) (Hurd, M.J.).

[34]      *Collins*, 423 F. Supp.2d at 415-16 (quoting *Lewis*, 518 U.S. at 355).

(and perfectly constitutional) consequences of conviction and incarceration.'"[35]

Here, Plaintiff has not alleged facts plausibly suggesting that Defendant Hilton acted *deliberately* and *maliciously* in interfering with Plaintiff's right to petition government officials for the redress of grievances.  The closest that Plaintiff comes to doing so is when he alleges that, immediately before he was placed in a "strip cell" on October 24, 2002, Defendant Hilton told him that "all the pain and discomfort that plaintiff was suffering was maybe a revenge."  (Dkt. No. 24, ¶ 16.)  Again, this is too cryptic and innocuous a statement to plausibly suggest deliberate malice, especially when one considers Plaintiff's other allegations, which plausibly suggest that Defendant Hilton (who was a prison psychologist) rather promptly responded to Plaintiff's claims of experiencing delusional symptoms, at least one time with an inquiry as to whether the symptoms were getting worse.  (*Id*. at ¶¶ 12, 13, 15, 16.)

Even if Plaintiff had alleged such facts, he has not alleged facts plausibly suggesting that Plaintiff suffered any actual injury or that such actual injury was *caused* by Defendant Hilton (as opposed to being caused by someone else, such as Defendant Langbart).  For example, as stated earlier, it was Defendant Langbart, not Defendant Hilton, whom Plaintiff alleges wrongfully transferred him to the CNYPC less than a week after this October 24, 2002, placement in a "strip cell."  (*Id*. at ¶ 18 & Exs. 1-2.)  As a result, I am persuaded that Defendant Hilton's lack-of-personal-involvement argument serves as an alternative ground for dismissing Plaintiff's interference claim against Defendant Hilton.[36]

---

[35]     *Id.*

[36]     As stated earlier, I note that none of the paragraphs (of Plaintiff's Third Amended Complaint) cited in Plaintiff's opposition memorandum of law actually allege facts plausibly suggesting Defendant Hilton's personal involvement in any constitutional violation.  (*See*, *supra*,

For both of these alternative reasons, I recommend that the Court dismiss Plaintiff's First Amendment interference claim against Defendant Hilton.

### B.        Whether Plaintiff Has Failed to State an Eighth Amendment Claim

Liberally construed, Plaintiff's Third Amended Complaint asserts two related but different types of Eighth Amendment claims against Defendant Hilton: (1) a claim that Defendant Hilton was deliberately indifferent to Plaintiff's serious medical needs (for example, by "arbitrarily classifying him as mentally ill"); and (2) a claim that Defendant Hilton subjected Plaintiff to "cruel and unusual" prison conditions by harassing him for writing to public officials, and by placing him, without justification, in a "strip cell with just his underwear and a mattress." (Dkt. No. 24, ¶¶ 16, 47 & Prayer for Relief, ¶ A.1.)

### 1.        Deliberate Indifference to a Serious Medical Need

Generally, to prevail on such a claim, a plaintiff must show two things: (1) that the plaintiff had a sufficiently serious medical need; and (2) that the defendant was deliberately indifferent to that serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).

Here, the only serious medical needs that Plaintiff plausibly alleges are (1) a mental illness involving delusions and/or (2) a collection of skin irritations coupled with possible exposure to cold temperatures (due to his placement in a "strip cell" with only his underwear and a mattress for five days). (Dkt. No. 24, ¶¶ 15, 16, 18, 47.) For the sake of argument, I will set aside the fact that Plaintiff appears to deny that he is, in fact, mentally ill. (*Id*. at ¶¶ 10, 47.) I will also assume that, taken together, these conditions constitute a *serious medical need* for

note 29 of this Report-Recommendation.)

purposes of the Eighth Amendment.

The problem is that Plaintiff has asserted no facts plausibly suggesting that Defendant Hilton acted with any deliberate indifference with regard to this (presumed) serious medical need.  To the contrary, Plaintiff alleges facts plausibly suggesting that Defendant Hilton "interviewed" him five times regarding his mental condition, always promptly responding to Plaintiff's claims of experiencing delusional symptoms, and at least once specifically inquiring as to whether the symptoms were getting worse.  (*Id*. at ¶¶ 10, 12, 13, 15, 16.)[37]  Granted, Plaintiff also alleges that, immediately before he was placed in a "strip cell" on October 24, 2002, Defendant Hilton told him that "all the pain and discomfort that plaintiff was suffering was maybe a revenge."  (*Id*. at ¶ 16.)  However, this statement–in addition to being cryptic in nature–is too innocuous to plausibly suggest that Defendant Hilton possessed the state of mind necessary to be *deliberately indifferent*, which is a state of mind akin to *criminal recklessness*.[38]

_____

[37]      I note that Plaintiff also alleges facts plausibly suggesting that, during the relevant time period (December 27, 2001, to October 29, 2002), he received medical care from other employees of Auburn C.F.  (*See, e.g.*, Dkt. No. 24, ¶ 11, 16.)

[38]      *Farmer v. Brennan*, 511 U.S. 825, 827 (1994) ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for "deliberate indifference" under the Eighth Amendment."); *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness . . . .") [citation omitted]; *accord, Koehl v. Greene*, 06-CV-0478, 2007 WL 2846905, at *17, n. 98 (N.D.N.Y. Sept. 26, 2007) (Kahn, J.), *Richards v. Goord*, 04-CV-1433, 2007 WL 201109, at *15, n.124 (N.D.N.Y. Jan. 23, 2007) (Kahn, J.), *Salaam v. Adams*, 03-CV-0517, 2006 WL 2827687, at *10, n.59 (N.D.N.Y. Sept. 29, 2006) (Kahn, J.).

25

Plaintiff is not alleging facts plausibly suggesting criminal recklessness, only facts plausibly suggesting negligence or malpractice.  (*See*, *e.g.*, *id*. at 47 [alleging that Defendant Hilton "arbitrarily classif[ied] plaintiff as mentally ill"].)  A claim of negligence or malpractice by a prison medical care provider is not actionable under 42 U.S.C. § 1983.[39]

For both of these alternative reasons, I recommend that the Court dismiss Plaintiff's Eighth Amendment inadequate-medical-care claim against Defendant Hilton.

## 2.    Inadequate Prison Conditions

Generally, to prevail on such a claim, a plaintiff must show two things: (1) that the conditions of his confinement resulted in deprivation that was *sufficiently serious*; and (2) that the defendant acted with *deliberate indifference* to the plaintiff's health or safety.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Davidson v. Murray*, 371 F. Supp.2d 361, 370 (W.D.N.Y. 2005).

Here, the only serious conditions of confinement that Plaintiff plausibly alleges are (1) repeated "interviews" by Defendant Hilton (regarding Plaintiff's complaints of the symptoms described above in Part I.C. of this Report-Recommendation), which conceivably caused Plaintiff

---

[39]    *Farmer*, 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo*, 94-CV-1684, 1998 WL 166840, at *4 (N.D.N.Y. Apr. 9, 1998) (Pooler, J.) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence. . . . Disagreement with prescribed treatment does not rise to the level of a constitutional claim. . . . Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate. . . . Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].

to experience anxiety or pressure, and/or (2) incarceration in a "strip cell" for five days (with only

his underwear and a mattress) when Plaintiff was suffering from a skin irritation and presumably

a mental illness.  (Dkt. No. 24, ¶¶ 15, 16, 18, 47.)  I have some difficulty concluding that these

conditions of confinement, even taken together, are *sufficiently serious* for purposes of the Eighth

Amendment.  *See Lock v. Clark*, 90-CV-0327, 1992 U.S. Dist. LEXIS 21991, at *1, 11-12 (N.D.

Ind. March 17, 1992) ("The deprivations alleged by Mr. Lock in this case [which consisted of

being confined for seven days in a "strip cell" in a segregation unit] fail to satisfy the objective

component of his Eighth Amendment conditions claim, and they do not rise to the level of a

constitutional violation."); *Dunkley v. Tate*, 07-CV-0465, 2007 U.S. Dist. LEXIS 73166, at *2-4

(W.D. Va. Oct. 1, 2007) (confinement in "strip cell" for three days did not violate Eighth

Amendment as a matter of law).[40]  For example, Plaintiff does not allege that, while in the "strip

cell" for five days, he was deprived of "the minimal civilized measure of life's necessities,"

*Farmer*, 511 U.S. at 834, such as medical care, food, water, warmth or a toilet.

Moreover, I note that, in this cruel-and-unusual *punishment* claim, Plaintiff has alleged

facts plausibly suggesting that he was placed in a strip cell not as *punishment* but for non-

punitive reasons such as (1) to protect his own safety,[41] (2) to protect other prisoners' safety,[42] (3)

---

[40]    *See also Lewis v. Angelone*, 00-CV-0161, 2001 U.S. Dist. LEXIS 25539, at *12
(E.D. Va. May 16, 2001) ("Lewis has failed to allege facts which suggest his [24-hour]
confinement in the strip cell and his confinement in segregation were sufficiently severe and
prolonged as to give rise to an Eighth Amendment claim.") [citation omitted]; *Winn v. Delaware
Dept. of Corr.*, 02-CV-0034, 2003 U.S. Dist. LEXIS 18678, at *11 (D. Del. Sept. 30, 2003)
("Plaintiff has not presented any facts proving that State Defendants' placing him on strip cell
status involves the wanton and unnecessary infliction of pain [sufficient to establish an Eighth
Amendment claim.").

[41]    (Dkt. No. 24, ¶¶ 7, 9, 12 [alleging that he was physically assaulted by other
inmates on November 23, 2001, and December 24, 2001, and that, *inter alia*, he felt "violent

to protect prison employees' safety,[43] and/or (4) to await a transfer to CNYPC.[44]

However, even if one were to assume that, taken together, the conditions of confinement alleged by Plaintiff are *sufficiently serious* for purposes of the Eighth Amendment, Plaintiff's inadequate-prison-condition claim would fail.  This is because, again, Plaintiff has asserted no facts plausibly suggesting that Defendant Hilton acted with any deliberate indifference to Plaintiff's health or safety.  (*See*, *supra*, Part III.B.1. of this Report-Recommendation.)  Indeed, the allegations of Plaintiff's Third Amended Complaint plausibly suggest that Defendant Hilton acted with due regard to Plaintiff's health or safety.  (*Id*.)  I note that the "symptoms" of which Plaintiff repeatedly complained to public officials included a belief that his "mind was being read," that he saw "waking visions," that he felt "violent itching" which could not be stopped, that he lacked control of his arms and legs, that he was being scarred and burned by "electrical shock[s]," and that he was being "provoked by female staff."  (*Id*. at ¶ 12.)  Simply stated, Plaintiff's allegations plausibly suggested that he was a danger to himself (and others) and in need of "interviews" conducted by Defendant Hilton, and placement in a "strip cell" for five days pending a transfer to the CNYPC, where he could receive further evaluation and appropriate

---

itching" which could not be stopped, and he lacked control of his arms and legs].)

[42]    (*Id*. at ¶ 7 [alleging that, on November 23, 2001, Plaintiff got in a fight with another inmate].)

[43]    (*Id*. at ¶¶ 12, 40, 42 [alleging that the symptoms he experienced included a belief that his "mind was being read" by DOCS, that his hearing was being manipulated by DOCS, that he was being scarred and burned by "electrical shock[s]" administered by DOCS, and that he was being "sexually provoked by female staff."].)

[44]    (*Id*. at ¶¶ 16, 18 [alleging that, five days after Plaintiff was placed in a "strip cell," he was transferred to CNYPC].)

treatment.

For this reason, I recommend that the Court dismiss Plaintiff's Eighth Amendment prison-conditions claim against Defendant Hilton.

**C.      Whether Plaintiff Has Failed to State a Fourteenth Amendment Claim**

Liberally construed, Plaintiff's Third Amended Complaint asserts two different Fourteenth Amendment claims against Defendant Hilton: (1) a claim that Defendant Hilton violated Plaintiff's substantive due process and/or procedural due process rights; and (2) a claim that Defendant deprived Plaintiff of equal protection under the laws. (Dkt. No. 24, ¶ 47 & Prayer for Relief, ¶ A.1.)

**1.      Due Process**

The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinernon v. Burch*, 494 U.S. 113, 125 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon*, 494 U.S. at 125 [internal quotations marks and citation omitted]. The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property . . . *without due process of law*." *Id*. at 125-126 [internal quotations marks and citations omitted; emphasis in original]. One of the differences between the two claims is that a substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process" (which may occur *after* the wrongful action in question). *Id*.

a.        **Substantive Due Process**

"Substantive due process protects individuals against government action that is arbitrary, . . . conscience-shocking, . . . or oppressive in a constitutional sense, . . . but not against constitutional action that is incorrect or ill-advised." *Lowrence v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) [internal quotations marks and citations omitted], *aff'g*, 91-CV-1196, *Memorandum-Decision and Order* (N.D.N.Y. Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).

The first step in a substantive due process analysis is to identify the constitutional right at stake.  Plaintiff does not indicate what right he is claiming.  For the sake of argument, I will assume that Plaintiff possessed a protected liberty interest in remaining free from confinement in a strip cell and/or transfer to CNYPC unless DOCS has obtained reasonable grounds to believe that he was suffering from a mental illness involving delusions to such an extent that he poses a threat to himself or others in the correctional facility.[45]

The next step in a substantive due process analysis is to consider whether the state action was arbitrary in the constitutional sense and therefore violative of substantive due process.  Here, I find that Plaintiff has alleged no facts plausibly suggesting that the state action was arbitrary in the constitutional sense and therefore violative of substantive due process.  Indeed, Plaintiff has

--------

[45]        I note that I do *not* liberally construe Plaintiff's Third Amended Complaint as alleging that he was forcibly injected with anti-psychotic medications (or that he possessed a protected liberally interest in being free from such forcible injections)–a constitutional claim that I understand he tried to assert in his original Complaint. (*See* Dkt. No. 5, at 5-6 [Order of Judge Kahn, referring to this attempted claim].)  The closest Plaintiff comes to making this claim is when he alleges that, on December 27, 2001, he told Defendant Hilton that he did not want to "take any psychotrophic medication." (Dkt. No. 24, ¶ 10.)  Notably missing is any allegation that he was subsequently forced (by Defendant Hilton or anyone) to take any such medication.

alleged facts plausibly suggesting that, far from being arbitrary, the actions of Defendant Hilton were reasonable and appropriate.  In addition to the litany of delusional symptoms acknowledged by Plaintiff (described above), I note that, when "interviewed" about them, Plaintiff steadfastly persisted in his beliefs,[46] and refused treatment.[47]

As a result, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment substantive due process claim against Defendant Hilton.

**b.      Procedural Due Process**

"[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State . . . ; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient . . . ."  *Kentucky Dept. of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).

Here, I find that the Due Process Clause does not give Plaintiff a liberty interest in remaining free from confinement to a "strip cell," given the duration and conditions of that confinement, as alleged by Plaintiff (described above).  *See Dunkley v. Tate*, 07-CV-0465, 2007 U.S. Dist. LEXIS 73166, at *2-4 (W.D. Va. Oct. 1, 2007) ("In this case, while the conditions of Dunkley's confinement in the strip-cell [for three days] were more restrictive than those applied to inmates in the general population and possibly even segregation, they were not nearly so restrictive and atypical as those at issue in *Wilkinson* [*v. Austin*, 545 U.S. 209 (2005)]. Therefore, the court finds that Dunkley did not have a liberty interest in remaining out of the

---

[46]      (Dkt. No. 24, ¶¶ 13, 15, 16.)

[47]      (*Id*. at ¶¶ 10, 15 & Exs. 8-9.)

31

strip-cell and, thus, his due process claim fails.").[48]

Even if I were to find that Plaintiff possessed a limited such liberty interest, I would find that Plaintiff was, according to his own allegations, given all the process to which he was due under the circumstances.  For example, I note that Plaintiff's placement in a "strip cell," and transfer to the CNYPC, was immediately proceeded by not only three "interviews" with a psychologist about claims of delusional symptoms but a fourth "interview" with both a psychologist *and* a psychiatrist.  (Dkt. No. 24, ¶¶ 12, 13, 15, 16.)  This last "interview," conducted by two doctors, is reminiscent of the examination conducted by two physicians, under the New York State law, prior to a patient's involuntary commitment to a psychiatric hospital.  *See* N.Y. Correction Law § 402(1); N.Y. Mental Hygiene Law ¶ 9.27(a).  Furthermore, here, Plaintiff was not even involuntarily *committed* to a psychiatric hospital, only temporarily *transferred* to one (where he previously had been committed) on an emergency basis (for "closer observation" and "diagnostic clarification" as stated in one medical record).[49]

As a result, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment procedural due process claim against Defendant Hilton.

## 2.    Equal Protection

To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he was intentionally treated differently from others similarly situated as a result of intentional or

---

[48]     *See also Winn v. Delaware Dept. of Corr.*, 02-CV-0034, 2003 U.S. Dist. LEXIS 18678, at *8, 14 (D. Del. Sept. 30, 2003) ("Because plaintiff does not have a constitutionally protected liberty interest at issue, plaintiff's claims [arising from his placement in a 'strip cell' apparently several times for periods of 24 hours] will be dismissed.").

[49]     (Dkt. No. 24, ¶¶ 8, 10, 18 & Ex. 9.)

purposeful discrimination directed at an identifiable or suspect class. *Travis v. N.Y. State Div. of Parole*, 96-CV-0759, 1998 U.S. Dist. LEXIS 23417, at *11 (N.D.N.Y. Aug. 26, 1998) (Sharpe, M.J.), *adopted*, 96-CV-0759, Decision and Order (N.D.N.Y. filed Nov. 2, 1998) (McAvoy, C.J.). Where the alleged classification involves a "suspect class" or "quasi-suspect class," the alleged classification is subject to "strict scrutiny" by a court. *Travis*, 1998 U.S. Dist. LEXIS 23417, at *11.  However, neither prisoners nor the mentally ill comprise a suspect or quasi-suspect class for Equal Protection purposes. *See Holley v. Carey*, 04-CV-2708, 2007 U.S. Dist. LEXIS 64699, *23 (E.D. Cal. Aug. 31, 2007) ("[N]either prisoners nor persons with mental handicaps are a suspect class entitled to heightened scrutiny.") [citations omitted]; *Coleman v. Martin*, 04-CV-72534, 363 F. Supp.2d 894, 902 (E.D. Mich. 2005).  As a result, the alleged classification is subject to only "rational basis scrutiny." *Holley*, 2007 U.S. Dist. LEXIS 64699, at *23; *Coleman*, 363 F. Supp.2d at 902.  To survive such scrutiny, the alleged classification need only be "rationally related" to a "legitimate state interest." *Holley*, 2007 U.S. Dist. LEXIS 64699, at *23; *Coleman*, 363 F. Supp.2d at 902.

Here, Plaintiff has not even alleged facts plausibly suggesting there has been any *classification* at all in this case, i.e., that he was treated differently from anyone else.  In any event, he has not alleged any facts plausibly suggesting that the "discrimination" he allegedly experienced was not rationally related to a legitimate state interest, namely, the preservation of safety and order in its prisons, and the diagnosis and treatment of mentally ill prisoners.

As a result, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment equal protection claim against Defendant Hilton.

**D.      Defendant Hilton's Qualified Immunity Argument**

Because I have already concluded that adequate grounds exist upon which to base a recommendation of dismissal of Plaintiff's claims against Defendant Hilton, I need not, and do not, reach the merits of Defendant Hilton's alternative argument in favor of dismissal, namely, his qualified immunity argument.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendant Hilton's motion to dismiss (Dkt. No. 37) be **<u>GRANTED</u>**; and it is further

**RECOMMENDED** that those of Plaintiff's claims against Defendant Hilton that are not the subject of Defendant Hilton's motion to dismiss (Dkt. No. 37) be **<u>DISMISSED</u>** pursuant to the Court's authority to do so under 28 U.S.C. § 1915(e)(2)(B)(ii), 28 U.S.C. § 1915A(b), and/or Fed. R. Civ. P. 12(h)(3), for the reasons stated above; and it is further

**RECOMMENDED** that Plaintiff's claims against Defendant Langbart be **<u>DISMISSED</u>** with prejudice for failure to serve, for the reasons stated above.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs*., 892 F.2d 15 [2d Cir. 1989]); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: December 28, 2007
          Syracuse, New York

George H. Lowe
United States Magistrate Judge